IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NE COLORADO CELLULAR, INC., a Colorado Corporation d/b/a VIAERO WIRELESS,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF NORTH PLATTE,<br><br>Defendant. | 4:14-CV-3088<br><br>MEMORANDUM AND ORDER |

    This matter is before the Court on cross-motions for summary judgment filed by the plaintiff NE Colorado Cellular, Inc., doing business as Viaero Wireless (Viaero) and the defendant, the City of North Platte. Filings 37 and 34. Viaero seeks relief for several alleged violations of the Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104–104, 110 Stat. 56, arising from the City's denial of its application for a conditional use permit for the construction of a telecommunications tower. Viaero argues that the denial violated 47 U.S.C. § 332(c)(7)(B)(iii) because it was not supported by substantial evidence contained in a written record. Viaero also asserts that the City has, in the past, granted similar applications from competing service providers, and that the present denial violated § 332(c)(7)(B)(i)(I), which prohibits local governments from "unreasonably discriminat[ing] among providers of functionally equivalent services."[1] In its cross-motion, the City argues that it did not violate the TCA and seeks dismissal of Viaero's complaint.

    This is the second such lawsuit between these parties to come before this Court. The previous case also involved an application by Viaero for a conditional use permit to construct a telecommunications tower, albeit in a different part of North Platte. In that case, the Court found, among other things, that the City's denial was supported by substantial evidence, and entered judgment for the City. *See NE Colorado Cellular, Inc. v. City of North*

---

[1] Viaero's complaint alleged several other violations of the TCA. Filing 1 at 6–9. Viaero has since withdrawn these allegations. Filing 39 at 2.

*Platte, Neb.*, case no. 4:12-cv-3122, filing 31, *affirmed*, 764 F.3d 929 (8th Cir. 2014) ("*North Platte I*").

In contrast, in this case, the Court finds that the City's denial of Viaero's application was not supported by substantial evidence. The Court will therefore enter an injunction ordering the City to approve Viaero's application without delay. The Court finds it unnecessary to consider Viaero's assertion of provider discrimination under § 332(c)(7)(B)(i)(I) as it would not entitle Viaero to any further relief.

I. BACKGROUND[2]

Viaero is licensed by the Federal Communications Commission to provide personal wireless services, otherwise known as Commercial Mobile Radio Service (CMRS) in parts of Colorado and Nebraska, including the City of North Platte and the area surrounding the City. Filing 29 at ¶ 3. CMRS operates through the sending and receiving of signals transmitted between a mobile device, such as a wireless phone, and antennae mounted on towers, poles, or other structures. Filing 29 at ¶ 8. Around the beginning of 2014, Viaero sought to build a telecommunications tower on a site within the City of North Platte in order to improve its network coverage in the area. Viaero analyzed the area to identify suitable locations for a tower, and this yielded a viable site, located at 1600 E. 5th Street ("the site"). Viaero then negotiated the purchase of a perpetual easement on a portion of the site from its existing owner, Gilbert Rivera. Filing 29 at ¶ 10; filing 30-6 at 3. The site consists of a vacant lot, which Rivera uses as overflow parking for his adjacent bar and tobacco shop. Filing 30-1 at 1, 8.

Under the North Platte Code of Ordinances ("N.P. Code"), the site is zoned "B-2" (Highway Commercial Zone), a zoning classification which is eligible for the placement of a telecommunications tower after receipt of a conditional use permit, which must be reviewed by the North Platte Planning Commission and approved by the North Platte City Council. Filing 29 at ¶ 11; *see also* N.P. Code §§ 156.195, 156.197(A)(8), 156.321 (filing 33-2 at 11–12, 22). The parties' dispute centers on an ordinance setting forth general standards for conditional use permits, N.P. Code § 156.322 (filing 33-2 at 22). That section provides that conditional uses must, among other things, "be in harmony with the character of the area" and be "the most appropriate use of the land." N.P. Code § 156.322(A)(5) (filing 33-2 at 22). In considering

---

[2] The parties have stipulated to many of the relevant facts. *See* filing 29. Additionally, the facts in this case are drawn from the administrative record, (i.e., the record before the City Council) and while the legal significance of the facts in the administrative record is subject to dispute, the facts themselves are not.

whether to grant a conditional use permit, the Planning Commission and City Council may consider, among other factors, "the conservation and stabilization of the value of property, adequate open space for light and air, concentration of population, congestion of public streets and the promotion of public safety, health, convenience and comfort." N.P. Code § 156.322(B) (filing 33-2 at 22).

In January 2014, Viaero filed an application for a conditional use permit for the purpose of constructing a 100-foot telecommunications tower, as well as an adjacent small equipment building for electrical equipment and a buried propane tank. Filing 29 at ¶ 12; filing 30-1 at 6. The proposed structures would be surrounded by a 6-foot chain-link fence topped with barbed wire. Filing 30-1 at 6. According to Viaero's application, the new tower would provide additional data capacity and improved coverage in the area. Filing 30-1 at 8.

On March 25, 2014, the Planning Commission held a public hearing on Viaero's application. Filing 30-3. The Commission received testimony from several residents who lived in the surrounding area, as well as a representative from Viaero. Filing 30-3 at 3–5. This testimony was similar to that later provided to the City Council (discussed below), although the testimony at the later City Council meeting was more detailed and included several additional witnesses. Judy Clark, the City Planning Administrator, informed the Commission that the site is "located in a commercial district with commercial uses surrounding the property." Filing 30-3 at 1, 2. The Planning Commission found that Viaero's application met the minimum siting standards. Filing 30-3 at 5. The Commission completed a summary report which was provided to the City Council. Filing 30-2. In that report, the Commission concurred with Clark's opinion as to the commercial nature of the area and recommended approval of Viaero's application. Filing 30-2 at 1.

The City Council considered Viaero's application at a public hearing held on April 1, 2014. Six North Platte residents testified in opposition to granting the conditional use permit, and another questioned why Viaero could not "co-locate" on an existing tower. Rivera and three Viaero representatives testified in support of Viaero's application. The City Council also received several exhibits, including, among other things, maps and photographs of the surrounding area. Filing 30-6 at 2–3; *see, e.g.*, filing 30-4; filing 30-5.

On the same day, the City Council issued its decision in a form resolution provided by the Planning Commission. Filing 30-7; filing 30-2 at 2–8. The City Council found that Viaero's proposed use failed to comply with N.P. Code § 156.322(A)(5), in that the proposed use was not "in harmony with the character of the area" and was not "the most appropriate use of the land."

Filing 30-7 at 2. A separate portion of the resolution stated that the City Council had considered the "following additional documentation/evidence . . . in denying this application: Testimony of property owners in the immediate area of the proposed tower site convinces the City Council that the area is predominantly residential in character." Filing 30-7 at 2 (formatting removed).

## II. ANALYSIS

The TCA was intended by Congress to foster competition among telecommunications providers, to improve the quality of their services, and to encourage the rollout of new technologies without delay. *USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of the City of Des Moines*, 465 F.3d 817, 819 (8th Cir. 2006). To better accomplish these goals, Congress sought to reduce the impediments imposed by local governments upon the installation of wireless communication facilities such as antenna towers. *Id.* However, the TCA specifically preserves the authority of local zoning boards "over decisions regarding the placement, construction, and modification of personal wireless service facilities," subject to certain substantive and procedural limitations. 47 U.S.C. § 332(c)(7)(A). "Essentially, the TCA 'strikes a balance between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" *USCOC of Greater Mo., LLC v. Cnty. of Franklin, Mo.*, 636 F.3d 927, 930 (8th Cir. 2011) (quoting *Omnipoint Commc'ns, Inc. v. City of White Plains,* 430 F.3d 529, 531 (2d Cir. 2005)). Among other things, the TCA requires that any decision by a local government denying permission to construct a telecommunications tower must be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Viaero argues that the City's decision was not supported by substantial evidence; the City counters that it was.

### A. Substantial Evidence Standard

The TCA's substantial evidence requirement does not impose substantive standards on local governments. *North Platte I*, 764 F.3d at 936. Rather, it requires a reviewing court to determine whether the local authority's decision comports with applicable local law. *Id.* Viaero bears the burden of showing that the City's decision was not supported by substantial evidence. *USCOC of Greater Iowa*, 465 F.3d at 820.

In determining whether the City's decision was supported by substantial evidence, the Court applies the traditional standard used for judicial review of agency determinations. *Sprint Spectrum, L.P. v. Platte Cnty., Mo.*, 578 F.3d 727, 733 (8th Cir. 2009). If the City's findings are

supported by some substantial level of evidence (but less than a preponderance) on the record as a whole (contrary evidence may not simply be ignored on review) so that a reasonable fact-finder could reach the same conclusion as did the City, the City's decision must be affirmed. *Id*; *see also North Platte I,* 764 F.3d at 936. The Court will not reject the City's decision as unsupported by substantial evidence because there exists the possibility of drawing two inconsistent conclusions from the evidence. *Sprint Spectrum,* 578 F.3d at 733. Under this standard, the Court cannot substitute its own determination for that of the administrative fact-finder just because the Court believes that the fact-finder is clearly wrong. *Id*. In short, the Court's review of local government decisions under the TCA is "essentially deferential." *USCOC of Greater Mo,* 583 F.3d 1035, 1042 (8th Cir. 2009). While deferential, this review is more than a rubber stamp for the locality's decision. *See T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty,, Kansas City, Kan.,* 546 F.3d 1299, 1307 (10th Cir. 2008); *cf. Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir. 1989).

### B. The Evidence the Court Has Considered

In conducting its substantial evidence review, the Court considers only the evidence contained in the administrative record, i.e., the evidence presented to the City Council. *See, Second Generation Props., L.P. v. Town of Pelham,* 313 F.3d 620, 628 (1st Cir. 2002). Viaero has submitted a DVD recording of the City Council's public hearing. Viaero exhibit O [hereinafter "Video at xx:xx:xx"]. It is true that the TCA refers to "substantial evidence contained in a *written* record." 47 U.S.C. § 332(c)(7)(B)(iii) (emphasis supplied). The Court nonetheless finds it appropriate to review this video recording of the hearing. The "written record" requirement exists to enable parties adversely affected by a locality's decision to efficiently and effectively seek judicial review, and to facilitate such review by courts. *Cf. T-Mobile South, LLC v. City of Roswell, Ga.,* 135 S. Ct. 808, 814–16 (2015). In this case, those purposes are served by consideration of the recording. Additionally, the City has not objected to the Court's review of the recording, and has stipulated to its authenticity. Filing 29 at 5.

Viaero has also submitted evidence that goes beyond the administrative record, including depositions of City Council members and the City Planning Administrator. *See, e.g.*, filings 30-8 through 30-13. The Court has not considered these materials.

### C. The City's Grounds for Denial

The Court understands the City Council's denial to be based on its finding that the proposed tower would not be in harmony with the character

of the area, which the City Council found to be predominantly residential.[3] On the record before the City Council, this finding was not supported by substantial evidence.

The site itself is used as overflow parking for Rivera's bar and tobacco shop to the south, and is zoned as a Highway Commercial zone. The site is surrounded by similarly-zoned lots. The land to the north of the site is zoned I-1 (Light Industrial) and includes an automotive repair shop and a lot used to store military vehicles for the Army Reserve. Filing 30-1 at 1, 8; filing 30-5 at 8; filing 30-6 at 3. Photographs of the area to the north of the lot show what appear to be warehouses and several military vehicles in a lot behind a chain-link fence. Filing 30-5 at 8; exhibit D-10.[4] The land to the south, west, and east is all zoned B-2 (Highway Commercial). To the south are Rivera's bar and tobacco shop. Filing 30-1 at 1, 8; filing 30-5 at 8. The lot to the west is vacant land used for storage, and photographs of that area show tractor trailers and another warehouse-type building. Filing 30-1 at 1, 8; filing 30-5 at 7.

Viaero's application states that the lot to the east is used for storage. Filing 30-1, at 8. The City does not dispute this characterization, nor is it contradicted by the record. There is, however, a small, old house on the lot to the east. Photographs of that lot confirm that it is used for storage. The photographs show that the house is surrounded by old, decrepit-looking trucks and trailers. Filing 30-6 at 3; exhibits D-8 and D-9. The owner of the lot, John Erickson, testified at the hearing, but he did not testify that he lived in the house, and when asked for his address at the hearing he provided a different one. Filing 30-6 at 2–3; Video at 22:00–26:05. Additionally, the concerns that Erickson expressed at the hearing were not related to the purportedly residential character of the area or the tower's "fit" with the character of the area. Instead, he expressed safety concerns regarding the propane tank and what might occur if the tower were to fall over.[5] Filing 30-6 at 2–3; Video at 22:00–26:05.

---

[3] The City Council also found that the proposed tower would not be the "most appropriate use of the land." But as in *North Platte I*, this statement does not appear to add anything of substance to the other findings—rather, it appears to simply be a conclusion that rests upon those findings. *See North Platte I*, case no. 4:12-cv-3122, filing 31 at 8 n.3. The City has not offered an explanation for why the tower would not be the most appropriate use for the site, other than its finding that it would not be in harmony with the predominantly residential character of the area.

[4] Due to their size, exhibits D1 through D-10 were not filed electronically but were submitted on a CD.

[5] He was not concerned about that the tower might fall on his adjoining property, as it was outside the 100-foot radius to the east. Rather, he was worried that if the tower fell, and fell

- 6 -

There are some residences in the area around the site. The nearest residence is 255 feet away; the second nearest is 441 feet away. Filing 38 at ¶ 9; filing 30-4; filing 30-5 at 3–9; filing 30-6 at 2–3. The owner of the house 255 feet from the site, Mel Sappenfield, along with his son, Michael, testified that they did not want a tower in the area because they were worried about property values and health issues the tower could cause.[6] Filing 30-6 at 2; *see also* Video at 16:00. Michael Sappenfield also expressed concern that potential future buyers of the house would be put off by the tower because it would be "across the street" from the house and the tower would be visible because "there is nothing else across the street but a big parking lot." V:17:00–19:15. However, after conferring with a City Council member over a map, he admitted that the tower would not be directly across the street from his father's house but further east down the street. V20:40–22:00. Michael Sappenfield also testified that there were other places

> just down the street where there's not a whole bunch of residences, there's not a whole bunch of businesses, there's not a bar right there. There's a place just north, there's a place just to the east, that it won't cause a big problem. There's not as many residences, there's not as much of a problem.

Video at 20:05–20:40

Two other residents, Louis Klewein and Don Wilson, testified that they believed the tower would lower the values of their properties situated near the site. Filing 30-6 at 3. They did not testify those properties were residential. Filing 30-6 at 3; Video at 27:00–29:20. Rather, Klewein testified that he owned several buildings directly across the street (to the north) of the site—in other words, the warehouse-type buildings depicted in several photographs in the record. Filing 30-5 at 3, 8; filing 30-6 at 3; Video at 27:00–29:20. Similarly, Wilson did not testify that he lived in the properties he owned, nor was there any evidence before the City Council that those properties, located in a business district, were residential. *See also* filing 30-5

---

to the north or south, it could land on the street to the north or power lines and an alley to the south. Filing 30-6 at 2–3; Video at 22:00–26:05.

[6] Congress has specifically prohibited state and local governments from regulating cell tower siting based on concerns regarding the health and environmental effects of electromagnetic radiation from such towers. *See* 47 U.S.C. § 332(c)(7)(B)(iv). While several other residents also expressed similar worries, there is no evidence that these prohibited concerns played any part in the City Council's decision.

at 3 (aerial photograph of area showing primarily industrial and commercial structures, vacant lots, and parking lots).

The City Council heard testimony from two other residents who did have houses in areas near the site. Judy Nichelson, who owns the house 441 feet from the site, acknowledged that her house was in an area zoned Light Industrial. Filing 30-6 at 3; Video at 29:45–30:15. She expressed concerns regarding the environmental and health impacts of cell towers, and opined that the site had drainage issues. Nichelson also testified that the tower would be an eyesore. Filing 30-6 at 3; Video at 30:15–34:15. She was concerned for the 100-year old trees on her property, which she described as an "oasis in this whole field of warehouses and different things that are there." Video at 30:30–30:45.

The City Council also heard testimony from Tami Yeutter, who lives near the site, somewhat to the east of the Sappenfield house. Filing 30-6 at 3. Yeutter was concerned about the unmaintained nature of the vacant lot on the site, which became muddy when it rained. She testified that she observed bar patrons driving their cars in the mud and "flipping kitties" (i.e. "doing doughnuts"). Video at 34:30–39:15. Yeutter also expressed concerns about the possible health and environmental effects of cell towers. She believed there were other, more suitable locations that were not "right in the middle of a business zone and a housing zone." Video at 38:30–38:50.

Although the witnesses who testified before the City Council expressed numerous concerns, their testimony did not tend to show that the area surrounding the site was predominantly residential in character. Rather, their testimony confirmed the essentially commercial character of the area. Nichelson acknowledged that her house was an "oasis" in an otherwise commercial area full of warehouses. Yeutter described the area as "a business zone and a housing zone." And while Michael Sappenfield testified that there were many residences in the area, he also testified that there were many businesses in the area, and that there were few residences "just north" and "just to the east" of the site. Video at 20:05–20:40.

The record as a whole confirms that, despite the presence of a handful of residences around the site, the area is predominantly commercial and industrial. Or, more to the point, there is not substantial evidence that it is predominantly residential. As the City Planning Administrator stated, the site is "located in a commercial district with commercial uses surrounding the property." Filing 30-3 at 1, 2. The site itself is used as overflow parking for the bar and tobacco shop to the south. To the north, west, and south are commercial and industrial uses. To the east is a house that appears to be used primarily as a storage yard for decrepit automobiles. Photographs of the area show that it is predominantly commercial and industrial in character.

Filing 30-5 at 4–8. An aerial photograph confirms that the site is surrounded largely by commercial or industrial structures, vacant lots, or parking lots. Filing 30-4, filing 30-5 at 1. Areas further removed from the site are zoned residential, but the site itself sits in the middle of an area that is predominantly commercial and industrial. *See* filing 30-4; filing 30-5. To the extent that the City's denial of Viaero's permit is based on the "predominantly residential" character of the surrounding area, the denial is not supported by substantial evidence.

The City's denial might be understood to rest upon broader aesthetic concerns. But such reasoning would also fail for lack of substantial evidence. Aesthetic concerns can be a valid basis for denial of a permit, so long as the aesthetic judgment is grounded in the specifics of the case and not based on generalized aesthetic concerns that are applicable to any tower, regardless of location. *Sprint Spectrum*, 578 F.3d at 733. To the extent that the residents who testified in opposition to the tower raised aesthetic concerns, their testimony "effectively amount[ed] to NIMBY—not in my backyard." *T-Mobile Cent., LLC v. Charter Tp. of West Bloomfield*, 691 F.3d 794 (6th Cir. 2012). But such "[g]eneral concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard are not sufficient." *Id.* at 800.

Local decisions on aesthetic grounds are more often affirmed when there is objective evidence to support the conclusions, such as photographs, site plans, surveys, and the like. *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 54 (1st Cir. 2012). In *Sprint Spectrum*, the Eighth Circuit upheld a city's denial on aesthetic grounds. In that case, the city objected to the proposed tower "because its size, location, and relationship to surrounding screening and landscaping were such that the tower would 'dominate the immediate neighborhood so as to prevent development and use of neighboring property.'" 578 F.3d at 732. These concerns were "buttressed by evidence regarding the specific location" of the proposed tower. *Id.* City officials conducted a visit of the site and received evidence that the 153-foot tall tower would "'visually dominate an otherwise residential area.'" *Id.* at 733–34.

Similarly, in *North Platte I*, the City Council had before it testimony from a dozen residents that the proposed tower would be an "eyesore," would be inappropriate for the neighborhood, and would not be harmonious with the neighborhood's historical and residential character. *See North Platte I*, 764 F.3d at 932, 936–37. These aesthetic concerns were sufficiently tied to the specific characteristics of the neighborhood and tower in question and were supported by photographic evidence. *See North Platte I*, case no. 4:12-cv-3122, filing 31 at 9–12.

- 9 -

Such specific concerns and evidence are lacking in the present case. Rather, the photographs and zoning maps in the record undercut any aesthetic concerns. The site is currently a vacant, muddy lot immediately surrounded by businesses and utilitarian structures, with the exception of an old home that is used for storage and is surrounded by decrepit automobiles and trailers. In short, to the extent that the City's denial was based upon aesthetics, it was not supported by substantial evidence.[7] The Court will therefore deny the City's motion for summary judgment and grant Viaero's motion for summary judgment.

### D. Injunctive Relief is the Proper Remedy

The TCA does not specify a particular remedy for violations of its provisions. *Tennessee ex rel. Wireless Income Properties, LLC v. City of Chattanooga*, 403 F.3d 392, 399 (6th Cir. 2005); *see* 47 U.S.C. § 332(c)(7)(B)(v). But generally speaking, when a locality has denied a permit without substantial evidence supporting the denial, the proper remedy is an injunction compelling the locality to issue the requested permit. *Id.* at 399–400; *see also*, *Nat'l Tower, LLC v. Plainville Zoning Bd. Of Appeals*, 297 F.3d 14, 21–22 (1st Cir. 2002); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1222 (11th Cir. 2002); *Oyster Bay*, 166 F.3d at 497 (2d Cir. 1999).

Viaero asks the Court to enter a permanent injunction:

- directing the City to approve the conditional use permit application, and directing the City to allow Viaero to construct, maintain, and operate the Facility at the Site.
- directing the City to issue the conditional use permit without further delay or obstacle, and in any event, not later than 7 days following the issuance of this Court's Memorandum and Order; and
- requiring the City to promptly grant any and all additional permits necessary for the Facility and directing the City to otherwise comply with the Telecommunications Act.

Filing 1 at 10. Viaero further requests that the Court maintain jurisdiction over this matter to ensure compliance.

---

[7] The witnesses at the hearing also spoke to other concerns, such as drainage issues and property values, but the City Council does not appear to have based its decision on these concerns. And to the extent that property values were considered, the record contained only a few generalized concerns about a potential decrease in property values, which is not substantial evidence. *See*, *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Tp.*, 181 F.3d 403, 409 (3d Cir. 1999); *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999).

Although the City has not objected, the Court is not, at this time, inclined to grant the full injunction requested by Viaero. Viaero has shown that the denial of its conditional use permit was not supported by substantial evidence, in violation of the TCA. But the Court has no reason to believe that the City will unduly delay issuing other necessary permits. For that matter, the Court does not know what other permits Viaero may be required to obtain to construct, let alone maintain and operate its tower and associated structures. At this time, Viaero has not shown that it needs or is entitled to the full injunction it has sought. Additionally, the Court is not inclined to formally maintain jurisdiction over this case, i.e., leave the case open and pending, absent reason to believe such supervision is warranted.[8]

The Court will direct the City to issue the conditional use permit without further delay or obstacle. And the Court will direct the City to do so no later than 10 days following the issuance of this Memorandum and Order. The City has not objected to Viaero's proposed 7-day limit and the Court has no cause to believe that a 10-day time limit would be unreasonable. If the City can show good cause, the Court will consider a further reasonable extension. Any such request for an extension must be filed no later than 7 days following the issuance of this Court's Memorandum and Order.[9] Accordingly,

IT IS ORDERED:

1. The City's motion for summary judgment (filing 34) is denied.

2. Viaero's motion for summary judgment (filing 37) is granted. Judgment is entered in favor of Viaero and against the City.

3. The City shall issue Viaero the requested conditional use permit without undue delay or obstacle, and in any event, not later than 10 days following the issuance of this

---

[8] It is worth noting that, should complications arise, a district court retains jurisdiction to manage its proceedings, vindicate its authority, and effectuate its decrees, even when a case is closed and judgment entered. *Jenkins v. Kan. City Mo. Sch. Dist.*, 516 F.3d 1074, 1081 (8th Cir. 2008); *see Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934).

[9] Additionally, the Court does not intend to shorten or interfere with the City's right to appeal, *see* Fed. R. App. P. 4(a)(1)(A), and the City is of course free to seek a stay of this Court's judgment and injunction pending any appeal. *See* Fed. R. App. P. 8; Fed. R. Civ. P. 62.

      Memorandum and Order.

4. If the City can show good cause, the Court will consider a further reasonable extension. Any such request for an extension must be filed no later than 7 days following the issuance of this Court's Memorandum and Order.

5. A separate judgment will be entered.

Dated this 4th day of June, 2015.

                      BY THE COURT:

                      _____
                      John M. Gerrard
                      United States District Judge